500 ASSOCIATES, INC., Appellant,

v.

NATURAL RESOURCES AND ENVI-
RONMENTAL PROTECTION
CABINET, Appellee.

Vermont American Corporation,
Cross-Appellant,

v.

500 Associates, Inc.; and Natural Re-
sources and Environmental Protec-
tion Cabinet, Cross–Appellees.

Nos. 2004–CA–000339–MR,
2004–CA–000451–MR.

Court of Appeals of Kentucky.

Sept. 22, 2006.

Glenn A. Cohen, Paul J. Hershberg, Cynthia L. Effinger, Louisville, KY, for Appellant, 500 Associates.

Charles G. Middleton III, Dana L. Collins, Louisville, KY, for Appellee, Vermont American Corporation.

Barbara M. Pauley, Troy A. McPeak, Frankfort, KY, for Appellee, Environmental Cabinet.

Before HENRY, JOHNSON, and SCHRODER, Judges.

## OPINION

JOHNSON, Judge.

500 Associates, Inc. (500) has appealed from the November 4, 2003, opinion and order of the Franklin Circuit Court which assessed liability for environmental contamination at a vacant industrial lot locat-

ed at 500 East Main Street in downtown Louisville, Kentucky, (the property site) where hazardous substances have been released. Vermont American Corporation (VAC) filed a cross-appeal in this case, appealing the same order.[1] Having concluded that the circuit court's ruling was not clearly erroneous, we affirm.

## FACTS

On February 12, 1998, the Natural Resources and Environmental Protection Cabinet, now known as the Environmental and Public Protection Cabinet, (the Cabinet) instituted the underlying action by filing an administrative complaint against VAC and 500 to hold both responsible for characterization and remediation of the property site. The Cabinet filed this case based on evidence collected by the Cabinet's Division of Waste Management (DWM)[2] which the Cabinet claimed showed a violation by both parties of Kentucky's Superfund statute, KRS[3] 224.01–400, by failing to comply with certain obligations regarding alleged hazardous substances that were released on the property site.[4] The Cabinet sought its response costs from VAC and 500, as well as substantial civil penalties.

From 1949 to 1986, VAC owned the subject property site and operated thereon its American Saw and Tool Division, where it manufactured circular saw blades and hand tools. During this 37–year period, VAC generated various hazardous wastes associated with its electroplating and metal heat treatment operations.[5] VAC was registered with the Cabinet as a large-quantity hazardous waste generator and produced an average of 65,470 gallons of waste water per day. VAC released untreated waste water and hazardous substances on numerous occasions during its ownership.

In March 1986 VAC closed its manufacturing operations and undertook steps to decommission the property. VAC hired Petrochem to restore the buildings to acceptable industry standards. All decommissioning took place inside the buildings, except for some cleaning and the partial removal of a roof on one of the buildings. These activities generated additional hazardous waste. After decommissioning, residues from the chemicals VAC had used and wastes it had generated were left in pits and trenches.

Subsequently, in 1986, 500, a group of

---

1. Both 500's and VAC's notices of appeal state that they are appealing the Franklin Circuit Court's order of January 20, 2004; however, this is the order overruling the Cabinet's motion to alter, amend, or vacate the circuit court's previous November 4, 2003, opinion and order. The November 4, 2004, order is the order that both 500 and VAC are appealing, as it is the final and appealable order.

2. To eliminate confusion, we will refer to all divisions of the Cabinet, including the DWM, as "the Cabinet" throughout this Opinion.

3. Kentucky Revised Statutes.

4. According to the Hearing Officer, the Cabinet's initial investigation in September 1994 of the site was under the federal Superfund

program, but because the site did not score high enough to justify further investigation, the site was transferred to the state Superfund program. VAC and 500 were notified by letters dated June 17, 1996, and October 28, 1996, that they were obligated under KRS 224.01–400 to characterize and remedy the releases on the site.

5. These operations included metal milling, metal heat treatment, degreasing, electroplating, and painting, and required considerable amounts of chemicals such as chromic acid, hydraulic acid, sulfuric acid, sodium hydroxide, sodium nitrate, nickel chloride, nickel sulfate, trichloroethene, 1–trichloroethane, toluene, cyanide compounds, acidic salts, and paints.

commercial [6] real estate developers, were working on a redevelopment plan and became interested in purchasing the buildings on the property and negotiations with VAC ensued. In 1987, 500 and VAC entered into a contract for purchase, which granted 500 access to the property for purposes of conducting an environmental audit. 500 then conducted a cursory pre-purchase investigation and inspection into the condition of the building and hired an environmental consultant named Ro–Tech, Inc. to evaluate VAC's decommissioning work. Ro–Tech inspected the property for hazardous chemicals and wastes. At this time, the principals of 500 had specific knowledge of the potential for discovery of hazardous materials at the property site, since they had purchased an industrial parcel next to the property which was contaminated with asbestos.[7]

Ro–Tech conducted an on-site inspection; obtained information regarding the decommissioning work performed by Petrochem; reviewed records concerning VAC's operations, wastes, and permits; and discussed the condition and cleanup of the property with VAC's environmental, health, and safety director Tim Daniel. Ro–Tech questioned Daniel regarding hazardous chemical spills and he represented that VAC had experienced only one hazardous chemical spill in 1982, involving approximately 100 gallons of nickel. According to Daniel, VAC had subsequently reported this spill to the Jefferson County Metropolitan Sewer District (MSD), but neither VAC nor MSD believed that the nickel spill posed an environmental hazard. Ro–Tech did not take any samples of environmental media or take samples of soil or groundwater as part of its assessment of the property site. Further, Ro–Tech did not review available public documents about the property.

In discussing the property with 500, Ro–Tech identified at least one hazardous substance, chromium, as a bi-product of VAC's operations. However, Ro–Tech concluded that Petrochem had followed adequate procedures in the decommissioning of the facility based upon the standards in existence at the time, and that VAC had adequately decontaminated the plating and waste treatment areas. Accordingly, Ro–Tech's report to 500 gave the site a clean bill of health prior to 500's purchasing the property, and recommended no further testing. On August 31, 1987, 500 purchased the property from VAC.[8]

500 claims that for more than a decade after it acquired the property, it had no knowledge of any spills. Accordingly, it took no extraordinary steps when it set about to remodel the structure. However, the Hearing Officer found that 500 was made aware by Ro–Tech's report that hazardous materials were handled on the site by VAC, that Ro–Tech failed to take soil samples, and that Ro–Tech identified at least one hazardous substance, *i.e.*, chromium, on the property. In 1990, 500 demol-

---

6. The Hearing Officer found that 500 should be treated as an industrial real estate developer because the property in question was industrial at the time of purchase, regardless of the fact that 500 might develop it into a commercial site.

7. 500 argues in its brief that while its association consisted of men experienced in the purchase of commercial real estate, none had any specialized knowledge or sophistication concerning industrial property, or industrial pro-

cesses such as those that VAC had used. Therefore, 500 argues that it delegated the inspection to Ro–Tech as professionals and expected Ro–Tech to identify any areas where potential exposure to hazardous materials existed, and to determine whether those areas had been adequately decontaminated.

8. Subsequently in 1999, Daniel admitted that VAC had released hazardous substances on other occasions during its industrial operations.

ished a portion of one of the buildings in order to create a courtyard, which was the same part of the property where VAC formerly conducted electroplating and waste water treatment operations. In doing so, 500 moved concrete and exposed the earth below. Also during 1990, 500 entered into an agreement to sell the property to Doe Anderson Advertising Agency. Doe Anderson hired its own environmental consultant, ERCE, to conduct a two-tier, pre-acquisition assessment of the property, which unlike the assessment conducted by 500, included a review of available public records and soil and groundwater sampling. Analytical results revealed presence of various inorganic constituents, elevated levels of metals, and volatile organic compounds. Further, samples from installed groundwater monitoring wells indicated various inorganic constituents along with chlorinated solvents exceeding the groundwater Maximum Containment Levels in 401 KAR [9] 34:060. Because extensive releases of hazardous waste had occurred at the property, and because ERCE's investigation revealed the residual effects of those releases, the level I pre-acquisition assessment included a recommendation to undertake further investigation of the potential environmental impact.

500 received a copy of the initial assessment in the fall of 1990. 500 claimed that this was when it first learned of contamination at the property, and acknowledged that samples taken from beneath the concrete floors revealed contamination. However, 500 stated that it contacted VAC after the findings of ERCE and repeated its request for information regarding the contamination. VAC provided no information, and again denied having any spills or releases during the operations that might have been the origin of contamination. 500 did not share ERCE's findings with the Cabinet, and it did not notify the Cabinet about contamination at the property after learning about it in 1990.

Despite information it had obtained from several sources, 500 still failed to take any remedial action at the property in response to data uncovered through the sampling analysis. ERCE then commenced a level II pre-acquisition assessment in order to identify concentrations of hazardous materials in the soil, water, and air. ERCE took four samples from the remaining pit and trench draining systems in three of the buildings. This report identified residual contamination in the pits in one of the buildings. Analytical results confirmed the presence of various inorganic constituents and volatile organic compounds.

In 1991, 500 retained a second consulting firm, Law Environmental, Inc., to conduct soil sampling on the property. Analytical results from 44 soil and soil gas samples across the property detected volatile organic compounds. Law Environmental confirmed the presence of hazardous substances, but found that the source was likely another property. 500 neither reported the results of Law Environmental's investigation to the Cabinet, nor took remedial action. However, Doe Anderson withdrew from the purchase agreement after these findings were made.

The Cabinet, in September 1994, began its investigation of the property by requesting information from VAC and 500 about releases of hazardous substances. On March 13, 1996, the Cabinet conducted groundwater sampling of the wells that were installed in 1990. Relying on the data developed during this sampling, the Cabinet informed 500 and VAC of the contamination and of their obligations under KRS 224.01–400. VAC denied that the site

9. Kentucky Administrative Regulations.

was a source of contamination, and claimed that 500 caused the releases when it demolished part of the building where VAC had conducted electroplating operations. The Cabinet's investigation confirmed the existence of contamination on the property site and in the groundwater. In 1996 the Cabinet informed VAC and 500 that both were obligated to characterize and remedy the releases on the property.

In March 1997 the Cabinet conducted soil sampling of the property for analysis, which revealed the presence of volatile organic compounds. Again, the Cabinet informed VAC of its statutory obligations and again VAC denied responsibility, saying 500 was responsible for the releases because it left the sampled areas unprotected and exposed to rainfall. Then, in June 1997, the Cabinet conducted further sampling of the groundwater monitoring wells, which upon analysis showed elevated levels of chromium, nickel, and other hazardous substances, more than ten years after any manufacturing operations had occurred on the property.

On February 12, 1998, after VAC and 500 had steadfastly refused for years to conduct remedial work, the Cabinet filed an environmental enforcement action against both VAC and 500 as jointly and severally responsible under KRS 224.01–400. The complaint alleged that VAC was a "responsible party" under the statute because it caused releases of hazardous substances into the environment and it also possessed and controlled hazardous substances that were released into the environment at the property site. The com-

plaint alleged that 500 was also a "responsible party" for the same reasons. The complaint further alleged that both parties were strictly liable for the releases and were required to characterize [10] the extent of any releases of hazardous substances, to correct the effect of the releases on the environment, and to reimburse the Cabinet for the actual and necessary costs it had expended and would expend in response to the releases. 500 then filed a contribution claim against VAC pursuant to KRS 224.01–400(25). VAC objected to the contribution claim, arguing that the Cabinet was not authorized to determine contribution claims. 500 then asserted it was entitled to the divisibility of harm and innocent purchaser defenses as provided in the Comprehensive Environmental Response Compensation Liability Act (CERCLA) § 113.[11] In May 1999 a third firm conducted additional characterization at the property. Analytical results from soil samples demonstrated elevated levels of various metals and volatile organic compounds.

This matter proceeded to a 17–day hearing before the Cabinet's Hearing Officer, at which 17 witnesses testified and over 70 exhibits were introduced. On May 8, 2002, the Hearing Officer issued an 89–page Report and Recommendation finding VAC and 500 jointly and severally liable for the releases of the hazardous substances into the environment. The Hearing Officer found, in relevant part, as follows:

In this enforcement action, the [Cabinet] has the burden of going forward

---

**10.** VAC has argued that it cannot be liable for providing a site characterization report when such was not required by the original statute in effect at the time it owned the property. Because we have concluded that VAC is liable under the statute for reasons other than the insufficiency of its site characterization report, we do not discuss this argument further.

**11.** KRS 224.01–400(25) provides as follows:

Defenses to liability, limitations to liability, and rights to contribution shall be determined in accordance with Sections 101(35), 101(40), 107(a) to (d), 107(q) and (r), and 113(f) of [CERCLA], as amended, and the Federal Clean Water Act, as amended.

and the burden of persuasion to establish by a preponderance of the evidence its entitlement to the remedies sought against VAC and 500. 401 KAR 100:010 Section 12(4); KRS 224.01–400(18). Under that same provision, VAC and 500 have the burden to establish their affirmative defenses.

[ ]

The liability statute currently in effect, KRS 224.01–400(18), states that: Any *person possessing or controlling a hazardous substance,* pollutant, or contaminant which is released to the environment, *or any person who caused a release* to the environment of a hazardous substance, pollutant, or contaminant, shall characterize the extent of the release as necessary to determine the effect of the release on the environment, and shall take actions necessary to correct the effect of the release on the environment [emphases original] [footnote omitted].

The Hearing Officer made the following recommendations to the Secretary of the Cabinet: (1) that he make a finding that VAC and 500 violated KRS 224.01–400 by causing releases of hazardous substances to the environment at the property and thereafter failing to characterize the extent of the releases as necessary to determine the effect of the releases on the environment, and that they failed to take action necessary to correct the effect of the releases on the environment; (2) that VAC be ordered to pay $160,000.00 and 500 be ordered to pay $10,500.00 in civil penalties; (3) that VAC and 500 be jointly ordered to characterize and remedy the releases and pay the response cost incurred by the Cabinet in the amount of $17,828.03; and (4) that both defendants be found jointly and severally liable to the Cabinet for all costs of characterization, remediation, and reimbursement, but that the parties be entitled to contribution from each other with VAC bearing 95% responsibility and 500 bearing 5% responsibility.[12] Both VAC and 500 filed exceptions to the Hearing Officer's Report and Recommendation. The Secretary adopted the Report and Recommendation in full as shown in the Secretary's Final Order entered on June 10, 2002. The Cabinet's Secretary, in adopting the Hearing Officer's Report and Recommendation, stated, in relevant part as follows:

1. The Hearing Officer's Report and Recommended Order filed in the record on May 8, 2002, is ADOPTED and incorporated by reference and made a part of this Final Order as if set forth verbatim in this Order.

2. [VAC] VIOLATED KRS 224.01–400 by causing a release to the environment of a hazardous substance, pollutant, or contaminant, and thereafter failing to characterize the extent of the release as necessary to determine the effect of the release on the environment, and failing to take actions necessary to correct the effect of the release on the environment.

3. [VAC] SHALL PAY to the Cabinet a civil penalty of one hundred sixty thousand dollars ($160,000) for the violations cited above pursuant to KRS 224.99–010.

4. [500] VIOLATED KRS 224.01–400 by possessing or controlling a hazardous substance, pollutant, or contaminant which is released to the

---

**12.** VAC has paid $17,828.03 and the response costs incurred by the Cabinet and awarded in this case.

environment, and thereafter failing to characterize the extent of the release as necessary to determine the effect of the release on the environment, and failing to take actions necessary to correct the effect of the release on the environment.

5. [500] SHALL PAY to the Cabinet a civil penalty of ten thousand five hundred dollars ($10,500) for the violation cited above pursuant to KRS 224.99–010.

. . .

7. The Defendants shall CHARACTERIZE the extent of the releases on the site. . . .

. . .

9. The Defendants shall REIMBURSE the [Cabinet] for its costs of $17,828.03 expended in responding to releases of hazardous substances at the site within 30 days of entry of this Final Order.

10. While both VAC and 500 are directly obligated to the Cabinet for the full expense and duty to characterize, remedy, and reimburse [the Cabinet's] costs, as between each other VAC and 500 are entitled to a right of proportionate contribution. As between them, VAC is 95% responsible and 500 is 5% responsible for those expenses.

Both VAC and 500 filed petitions for review of the Secretary's Final Order with the Franklin Circuit Court. The circuit court, by opinion and order dated November 4, 2003, affirmed in part and reversed in part the Final Order of the Secretary. The circuit court held that the Secretary had the authority to assess penalties

against both VAC and 500 and that the evidence supported the imposition of the penalties of $160,000.00 and $10,500.00, respectively. However, the circuit court agreed with VAC that the Secretary did not have the power to determine matters of contribution, and remanded the matter of the response costs and characterization and cleanup to the Secretary with the direction that the Secretary impose liability on one of the parties for these matters.[13] The circuit court rejected all of 500's arguments concluding that it could not be an innocent purchaser since there was substantial evidence to support the finding that Ro–Tech's investigation had been cursory and inadequate, and that 500 had not acted reasonably in relying on its expert's inspections. Further, the circuit court held that the Hearing Officer had acted properly in taking judicial notice that 500, by trenching and thereby exposing the contaminants to rainfall, had affirmatively contributed to the migration of the hazardous materials. While the Hearing Officer had predicated this conclusion on common sense, the circuit court located additional authority in the form of 401 KAR 34:210(1), for the proposition that precipitation can cause the diffusion, or leaching, of contaminants. Since the circuit court upheld the conclusion that 500's activities had exposed the previously latent chemicals to rainfall, it also affirmed the $10,500.00 penalty assessed against 500.

The Cabinet filed a motion to alter, amend, or vacate the opinion and order of the circuit court in which it argued that the Hearing Officer's findings and the Secretary's Final Order holding that VAC and 500 were jointly and severally liable for

---

**13.** The circuit court held that contribution was a remedy that could only be determined in a court and that on remand it was incumbent upon the Cabinet to impose the full amount of its response costs upon one of the defendants with that party then able to commence a common-law contribution action before the circuit court pursuant to KRS 224.01–400(25).

the Cabinet's response costs and characterization and cleanup obligations should not be disturbed. It argued that the finding that both parties violated KRS 224.01–400 and the decision to remand the matter to the Secretary to determine liability for the response costs and characterization and cleanup obligations rendered the opinion and order inherently inconsistent. On January 20, 2004, the circuit court issued a second opinion and order overruling the Cabinet's motion to alter, amend, or vacate the circuit court's previous November 4, 2003, opinion and order. Appeals by all three parties followed. The Cabinet filed a motion to dismiss its appeal on January 11, 2005, which was granted by this Court by order entered on April 27, 2005.

## STANDARD OF REVIEW

 Our standard of review[14] of a circuit court's affirmance of an administrative decision is to determine whether the circuit court's findings upholding the Cabinet's decision are clearly erroneous.[15] The circuit court's role as an appellate court is to review the administrative decision, not to reinterpret or to reconsider the merits of the claim,[16] nor to substitute its judgment for that of the agency as to the weight of the evidence.[17] Thus, the circuit court must determine both "[i]f the findings of fact are supported by substantial evidence of probative value" and "whether or not the administrative agency has applied the correct rule of law to the facts so found."[18] "The test of substantiality of evidence is whether ... it has sufficient probative value to induce conviction in the minds of reasonable [persons]."[19] Further, " 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by sub-

**14.** Pursuant to KRS 13B.150(1), "[r]eview of a final order shall be conducted by the court without a jury and shall be confined to the record[.]" Moreover, KRS 13B.150(2) states as follows:

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the final order or it may reverse the final order, in whole or in part, and remand the case for further proceedings if it finds the agency's final order is:

...

(b) In excess of the statutory authority of the agency;

(c) Without support of substantial evidence on the whole record;

(d) Arbitrary, capricious, or characterized by abuse of discretion; [or]

...

(g) Deficient as otherwise provided by law.

**15.** *Johnson v. Galen Health Care, Inc.*, 39 S.W.3d 828, 833 (Ky.App.2001). *See also* Kentucky Rules of Civil Procedure (CR) 52.01.

**16.** *Kentucky Unemployment Insurance Commission v. King*, 657 S.W.2d 250, 251 (Ky. App.1983); *Johnson*, 39 S.W.3d at 833.

**17.** *Kentucky State Racing Commission v. Fuller*, 481 S.W.2d 298, 309 (Ky.1972)

**18.** *Southern Bell Telephone & Telegraph Co. v. Kentucky Unemployment Insurance Commission*, 437 S.W.2d 775, 778 (Ky.1969) (citing *Brown Hotel Co. v. Edwards*, 365 S.W.2d 299 (Ky.1962)). *See also Kentucky Board of Nursing v. Ward*, 890 S.W.2d 641, 642–43 (Ky.App. 1994) (stating that "[w]hether an agency's ruling is arbitrary can be determined by looking at three factors: The court should first determine whether the agency acted within the constraints of its statutory powers or whether it exceeded them.... Second, the court should examine the agency's procedures to see if a party to be affected by an administrative order was afforded his procedural due process.... Finally, the reviewing court must determine whether the agency's action is supported by substantial evidence.... If any of these three tests are failed, the reviewing court may find that the agency's action was arbitrary").

**19.** *Fuller*, 481 S.W.2d at 308 (citing *Blankenship v. Lloyd Blankenship Coal Co.*, 463 S.W.2d 62 (Ky.1970)).

stantial evidence.'"[20] As long as there is substantial evidence in the record to support the agency's decision, the court must defer to the agency, even if there is conflicting evidence.[21]

An administrative agency, such as the Cabinet, is "afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses appearing before it" [citation omitted].[22] "[A]lthough a reviewing court may arrive at a different conclusion than the trier of fact in its consideration of the evidence in the record, this does not necessarily deprive the agency's decision of support by substantial evidence" [citation omitted].[23] Further, even if this Court would have come to a different conclusion if it heard the case *de novo*, it must affirm the administrative agency's decision if supported by substantial evidence.[24] "[I]t is the exclusive province of the administrative trier of fact to pass upon the credibility of witnesses, and the weight of the evidence" [citation omitted].[25] Indeed, an administrative agency's trier of facts may hear all the evidence " 'and choose the evidence that he believes'" [ci-

tation omitted].[26] " 'If the findings of fact are supported by substantial evidence of probative value, then they must be accepted as binding and it must then be determined whether or not the administrative agency has applied the correct rule of law to the facts so found' " [citations omitted].[27]

"It is fundamental that administrative agencies are creatures of statute and must find within the statute warrant for the exercise of any authority which they claim" [citation omitted].[28] When considering a claim, an administrative officer is not required to provide a detailed analysis of the facts and the law.[29] However, he is required to set forth sufficient facts to support conclusions that are reached, so the parties understand the decision, and to permit a meaningful appellate review.[30] Although a finding for which there is substantial evidence may not normally be disturbed on appeal, the parties "are entitled to at least a modicum of attention and consideration to their individual case[,]"[31] and to be certain that the decision was the product of a correct un-

**20.** *Fuller*, 481 S.W.2d at 307 (quoting *Chesapeake & Ohio Railway Co. v. United States*, 298 F.Supp. 734 (W.D.Ky.1969)).

**21.** *Kentucky Commission on Human Rights v. Fraser*, 625 S.W.2d 852, 856 (Ky.1981).

**22.** *Bowling v. Natural Resources & Environmental Protection Cabinet*, 891 S.W.2d 406, 409–10 (Ky.App.1995).

**23.** *Bowling*, 891 S.W.2d at 410.

**24.** *Id.* at 410.

**25.** *Id.*

**26.** *Id.*

**27.** *Johnson*, 39 S.W.3d at 832.

**28.** *Department for Natural Resources & Environmental Protection v. Stearns Coal & Lum-*

*ber Co.*, 563 S.W.2d 471, 473 (Ky.1978). *See also Pearl v. Marshall*, 491 S.W.2d 837, 839 (Ky.1973) (stating that "findings of fact are essential to support the orders of administrative agencies, at least where the order issued by the agency rests upon a factual determination.... The goal of the administrative process must be to insure uniformity of treatment by administrative agencies to all persons who are similarly situated").

**29.** *Big Sandy Community Action Program v. Chaffins*, 502 S.W.2d 526, 531 (Ky.1973).

**30.** *Shields v. Pittsburgh & Midway Coal Mining Co.*, 634 S.W.2d 440, 444 (Ky.App.1982). *See also Cook v. Paducah Recapping Service*, 694 S.W.2d 684, 689 (Ky.1985).

**31.** *Shields*, 634 S.W.2d at 444. *See also Kentland Elkhorn Coal Corp. v. Yates*, 743 S.W.2d 47, 49–50 (Ky.App.1988).

derstanding of the evidence.[32] After reviewing the entire record before us, we conclude that the circuit court's affirmance of the Secretary's Final Order was not clearly erroneous, as the Hearing Officer's recommendations were based on substantial evidence and were not arbitrary. The record reveals that the Cabinet acted within its powers granted by statute, there is no evidence that any party's due process rights were violated, there was substantial evidence to support the Cabinet's decision, and the correct rule of law was applied.

## 500'S ARGUMENTS

### Judicial Notice

500 argues on appeal that there was no evidence that it caused any of the harm at the property site and that it exceeded both the scope of the Hearing Officer's and the circuit court's power to take judicial notice of a scientific fact such as the effect of rain water on contamination of soil containing hazardous substances. KRE[33] 201, titled "Judicial notice of adjudicative facts" states in section (b) that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is ... (2)[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." In affirming the Cabinet's decision, the circuit court stated as follows:

> 500 claims that the [H]earing [O]fficer made two errors.... [S]econd the hearing officer took judicial notice of scientific hypotheses that were allegedly not supported by substantial evidence and arguably far from common knowledge.
>
> . . .

500's judicial notice argument fails.... When digging trenches to obtain soil samples, 500 allowed the trenches and soils removed from the trenches to remain exposed after sampling.... The [Cabinet] argues that these trenches contained hazardous chemicals that 500 exposed to at least one heavy rainfall and constituted a release.... A "[r]elease" is defined in the Kentucky Superfund statute .... [34] 500 takes the position the [H]earing [O]fficer erred by finding "it is a matter of common knowledge that exposing contamination to rainfall increases the potential for harm from contaminant migration ...". 500 finds fault with the following portion of the Report:

> 196.... I conclude that neither [500 nor VAC] was able to distinguish their proportionate contribution to (the [p]roperty). While VAC was the operator and clearly the source for all the materials on (the [p]roperty), I cannot determine what portion of the releases were caused by acts of 500. The *evidence and common sense dictate[ ]* that some share of the release occurred due to 500's allowing areas to be exposed to weather [emphasis original].

500 argues that no evidence in the record supports a finding that rain played any part in the contamination. 500 asserts that the ability of water to disseminate soil-based contaminants is not the subject of common sense but instead a scientific matter not appropriate for judicial notice. This Court disagrees. The Cabinet's regulations contain numerous acknowledgment of an increased potential for harm from precipitation. 401 KAR 34:210(1) imposes

---

**32.** *See Cook,* 694 S.W.2d at 689.

**33.** Kentucky Rules of Evidence.

**34.** KRS 224.01–400(1)(b).

a system for ensuring that hazardous waste piles are protected "from precipitation so that neither run-off nor leachate is generated." The [H]earing [O]fficer did not err by taking judicial notice that exposing contaminants to natural elements, such as rainwater, increases the likelihood of contamination migration. Courts have found where human activity causes movement of hazardous substances, the current landowner shares liability for the resulting harm.... [35]

Evidence demonstrates that 500's own activities caused releases of hazardous substances at the [p]roperty. 500 demolished buildings without taking any precautions to prevent hazardous materials inside the building from being released .... 500 removed roofs, walls and concrete floors of buildings exposing to the elements any hazardous materials beneath the floors.[36] ... Substantial evidence supports the imposition of a $10,500 penalty against 500....

While the Hearing Officer stated that judicial notice was proper in this case based on common sense, the circuit court further supported the use of judicial notice through reliance upon the Cabinet's administrative regulations. The Cabinet argues that when an administrative regulation is available there is no need for expert or lay testimony as to a scientific fact. However, it cites no support for this argument, and we are unable to find any law directly on point to support this argument. 500 argues that a number of courts have

recognized that the ultimate fact in question is not susceptible of judicial notice; however, it only points this Court to one case, *Joslyn Manufacturing Co. v. T.L. James & Co., Inc.*[37] We find its reliance upon *Joslyn* is misplaced.

In *Joslyn*, the federal district court ruled that a purchaser of a parcel of land was not the responsible party under CERCLA.[38] However, *Joslyn* and this case are distinguishable upon their facts. In *Joslyn*, the former owner of the property argued that the current owner would be the responsible party for the clean up of the land " 'even if [the current owner] had not moved a grain of dirt' " and "solely on the basis that rainfall obviously causes hazardous materials to leach through the soil."[39] The district court found that this was not sufficient evidence to sustain the former owner's burden of proof.[40] However, 500 did more in this case than simply own the property. 500 actually moved a contaminated building and left the resulting open areas exposed to rain, which 500's own expert stated could have caused contamination to the soil underneath.

500 provided expert testimony at the hearing before the Cabinet's Hearing Officer from Mark Mangun.[41] 500 argues that Mangun provided undisputed testimony that upon reviewing subsequent soil sample data, there was no scientific support that the contamination could be traced to the demolition of buildings, to rain, or to any 500 activity. 500 further argues that there was no other expert testimony pro-

---

**35.** *United States v. 150 Acres of Land,* 204 F.3d 698, 706 (6th Cir.2000).

**36.** *150 Acres of Land,* 204 F.3d at 706.

**37.** 836 F.Supp. 1264 (W.D.La.1993).

**38.** *Id.*

**39.** *Id.* at 1269–70.

**40.** *Joslyn,* 836 F.Supp. at 1270.

**41.** The Hearing Officer found that Mangun had been an environmental consultant for 20 years. Mangun testified that he had only performed two preacquisition site assessments during the time period when Ro–Tech performed its assessment for 500.

vided and no lay witnesses who testified of any personal knowledge to contradict Mangun's testimony.[42] Mangun also testified that the decommissioning activity by Petrochem prior to the purchase by 500 would have "almost certainly removed any contaminants from at or near the surface levels," and 500 thus argues that if there are no contaminates at or near the surface, then it could not have caused any contamination by removing the concrete.

 However, a closer look at Mangun's testimony shows that it was conflicting. Mangun testified that while 500 dealt with commercial property, the property in question was industrial in nature. He defined the difference as "commercial property would be more office buildings and industrial property usually has manufacturing." He testified that when performing an assessment, the type of property was the focus, not whether the clients were commercial versus industrial, while the extent of understanding of the two types of clients may vary. He stated that during the time period in which 500 purchased the property, it was unusual for buyers of commercial property to have inspections done as performed by Ro–Tech, but not uncommon for industrial buyers.[43] He stated that Ro–Tech's inspection was more than was typically done for commercial buyers. When performing these type of assessments for pre-purchase investiga-

tions, he would have reviewed "information supplied by the facility, the operations and process that went on at the facility, the data that [he] generate[d] or other consultants generated and then rely on [his] experience with geology and in site assessments to come to conclusions as to what the data means." He also would determine the current status of environmental regulations. Mangun testified this was the kind of information that is regularly relied upon by environmental consultants in investigating site characterization issues.

However, Mangun went on to state that based on the facts known about the property,[44] he would have probably recommended a soil sample, and he would have reviewed the records of the Cabinet and "probably" the records of the MSD, and the Jefferson County Pollution Control Board. Mangun admitted that there was contamination on the concrete and wall surfaces at the property site, and that 500's demolition activities and subsequent sampling may have caused the release of the contaminate in the soil environment. He acknowledged that it was possible when taking down contaminated buildings and removing their concrete floors, to "slightly" increase the mobility of contamination, and that rain falling into open trenches containing contamination possibly could have spread the contamination. He testified that certain industrial operations

---

**42.** 500 also points out in its brief that Jeff Grow, a Cabinet employee and registered geologist, testified that it would be "pure speculation" that the movement of concrete by 500 caused the contamination at the property site.

**43.** Mangun stated that this type of preacquisition industrial site assessment would involve "looking at prior uses of the site, [i]f the site was still in operation, talking to the current owners of what happened, coming up with past histories, doing a walk-through of the site, [and] interviewing people." He further stated that it would probably not include re-

view of the state environmental file, but sometimes would include the review of the corporate environmental file.

**44.** These facts included treatment of hazardous wastes in pits, disposal of hazardous wastes without treatment, including corrosives and acids in pipes to the city sewer, spilling of 2,400 gallons of nickel plating waste, use of degreasing solvents, storage of chlorinated solvents in aboveground storage tanks, and engaging in electroplating and degreasing operations for 37 years.

were more likely to impact the soil, including electroplating and degreasing, as were performed on the property site.

Mangun acknowledged that the Phase I and Phase II assessments performed by ERCE four years after the one performed by Ro–Tech was more expansive and included soil sampling. While Mangun stated that the standard and level of work changed overtime, the underlying purpose had not changed. Mangun further testified that he believed 500 was aware of the ERCE reports of contamination at the site, but he was not aware that 500 had taken any steps to actually clean up the contamination or to prevent migration of the contamination. The Hearing Officer had the discretion to weigh all parts of Mangun's testimony and to determine which parts to believe. Thus, even without taking judicial notice of leaching, there was substantial evidence of record from Mangun's testimony to support the finding of the Hearing Officer that 500's actions contributed to the cause of the contamination.

*The Innocent Purchaser Defense*

█ In the alternative to this argument, 500 asserts the innocent purchaser defense under CERCLA, as defined in 42 U.S.C.A. § 9607(b). As stated previously, a defendant in a Kentucky Superfund action may be eligible for the same defenses, limitations of liability, and rights of contribution available under CERCLA. The requirements for the innocent purchaser defense are set out in 42 U.S.C.A. § 9607(b) as follows:

There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

(1) an act of God;

(2) an act of war;

(3) *an act or omission of a third party* other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship,[45] ex-

---

**45.** 42 U.S.C.A. § 9601(35) defines contractual relationship as follows:

(A) The term "contractual relationship", for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

(i) At the time the defendant acquired the facility the defendant *did not know and had no reason to know* that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility [emphasis added].

(ii) The defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or

acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

(iii) The defendant acquired the facility by inheritance or bequest.

In addition to establishing the foregoing, the defendant must establish that the defendant has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title[.]

(B) Reason to know

(i) All appropriate inquires

To establish that the defendant had no reason to know of the matter described in subparagraph (A)(i), the defendant must demonstrate to the court that—

(I) on or before the date on which the defendant acquired the facility, the defendant carried out all appropriate inquiries, as provided in clauses (ii) and (iv), into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices; and

(II) the defendant took reasonable steps to—

isting directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions [emphasis added]; or

(4) any combination of the foregoing paragraphs.

The Hearing Officer explained this defense as follows:

> (aa) stop any continuing release;
> (bb) prevent any threatened future release; and
> (cc) prevent or limit any human, environmental, or natural resource exposure to any previously released hazardous substance.
> . . .
> (iv) Interim standards and practices
> (I) Property purchased before May 31, 1997 With respect to property purchased before May 31, 1997, in making a determination with respect to a defendant described in clause (i), a court shall take into account—
> (aa) any specialized knowledge or experience on the part of the defendant;
> (bb) the relationship of the purchase price to the value of the property, if the property was not contaminated;
> (cc) commonly known or reasonably ascertainable information about the property;
> (dd) the obviousness of the presence or likely presence of contamination at the property; and
> (ee) the ability of the defendant to detect the contamination by appropriate inspection.
> . . .
> (C) Nothing in this paragraph or in section 9607(b)(3) of this title shall diminish the liability of any previous owner or operator

Compiling these requirements as applicable in this case, the innocent purchaser defense is available if 500 establishes by a preponderance of the evidence all of the following: (1) 500 did not know and had no reason to know of the contamination, having undertaken appropriate inquiry at the time of the acquisition; (2) 500 exercised due care once the hazardous substance was discovered[;] and (3) some other party was the sole cause of the release. If 500 is unable to establish any one of the requirements, the defense is not available.[46]

 The innocent purchaser defense is an affirmative defense and thus the defendant is required to prove "each of the required elements by a preponderance of the evidence" [citations omitted].[47] " 'A defendant's failure to meet its burden on any one of the required elements pre-

> of such facility who would otherwise be liable under this chapter. Notwithstanding this paragraph, if the defendant obtained actual knowledge of the release or threatened release of a hazardous substance at such facility when the defendant owned the real property and then subsequently transferred ownership of the property to another person without disclosing such knowledge, such defendant shall be treated as liable under section 9607(a)(1) of this title and no defense under section 9607(b)(3) of this title shall be available to such defendant.
> (D) Nothing in this paragraph shall affect the liability under this chapter of a defendant who, by any act or omission, caused or contributed to the release or threatened release of a hazardous substance which is the subject of the action relating to the facility.

46. In addition to the due care requirements and precaution requirements of 42 U.S.C.A. § 9607(B)(3)(a) and (b), a defendant must prove the elements of 42 U.S.C.A. § 9601(35)(B). *See Foster v. United States*, 922 F.Supp. 642, 654 (D.D.C.1996).

47. *Foster*, 922 F.Supp. at 654.

cludes the application of the defense' " [citations omitted].[48] The Hearing Officer analyzed each element[49] of the innocent purchaser defense as set out in 42 U.S.C.A. § 9601(35)(B)(IV)(I)(aa-ee), and found that there was no distinction between 500's knowledge as a commercial developer or an industrial developer,[50] because 500 was purchasing industrial property that was located next to another piece of industrial property which was known by 500 to be asbestos-laden.[51] Holding 500 to the standard of an industrial developer, the Hearing Officer found 500's reliance on Ro–Tech's cursory inspection an inappropriate inquiry, "given the nature of known property use," and thus 500 failed to adequately evaluate commonly known or reasonably ascertainable information about the property site.[52] In evaluating "the obviousness of the presence or likely presence of contamination at the [property site]",[53] the Hearing Officer found that "[w]hile there was no visible mark from the releases, the nature of the operations at the facility increased the likelihood of contamination and warranted an investigation to determine with greater precision whether a release occurred." In addressing the fifth factor of " 'the ability to detect . . . contamination by appropriate inspection[,]' " the Hearing Officer stated as follows:

> Before it acquired this property, 500 could have conducted an appropriate investigation for contamination. According to the experts, an examination of public records would have suggested sampling was needed, and sampling has revealed contamination. Instead, 500 chose not to review public records or conduct sampling. 500's own expert at trial would have recommended sampling to an industrial user under the circumstances of the site at the time of the purchase. To reward 500's lack of diligence with a liability exemption would be directly contrary to the policy of CERCLA, which "does not sanction willful or negligent blindness."[54]

Further, the Hearing Officer found that after 500 acquired the property, it failed to exercise due care. The standard as set out under CERCLA states that the purchaser must establish that "he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances[.]"[55] While the Hearing Officer acknowledged that there was evidence that 500 took some steps to secure the property site from further harm of

---

**48.** *Id.*

**49.** The Hearing Officer found no evidence in the record regarding the second element that CERCLA lists, *i.e.,* "the relationship of the purchase price to the value of the property if uncontaminated." 42 U.S.C.A. § 9601(35)(B)(IV)(I)(bb).

**50.** This is relevant to the first element which states "any specialized knowledge or experience on the part of the defendant." 42 U.S.C.A. § 9601(35)(B)(IV)(I)(aa).

**51.** The Hearing Officer stated in her report: "Like it or not, 500 became a developer of industrial and commercial property and should be held to the standard of inquiry that a reasonable industrial developer would have made at that time."

**52.** 42 U.S.C.A. § 9601(35)(B)(IV)(I)(cc).

**53.** 42 U.S.C.A. § 9601(35)(B)(IV)(I)(dd).

**54.** The Hearing Officer cited *United States v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir. 1988) and *Westfarm Associates v. Washington Sub. Sanitary Com'n,* 66 F.3d 669, 682 (4th Cir.1995) in support of this holding.

**55.** 42 U.S.C.A. § 9607(b)(3)(a).

release,[56] there is also evidence to the contrary that 500 failed to exercise "due care" required under CERCLA, as the Hearing Officer stated as follows:

> [500] demolished buildings without taking any precautions to prevent materials in the buildings from being released to the environment. By removing the concrete floor and leaving material under it open to the elements, it allowed rainfall to be introduced into contaminated areas. It is a matter of common knowledge, requiring no expert opinion, that rainfall onto soil will facilitate movement of that soil and in this case contaminants. 500 also left exposed pits formerly associated with manufacturing operations after removing the roof and walls of buildings. An additional failure to exercise due care occurred in March, 1997, when one of the 500 principals helped direct excavation activities intended to expose materials to obtain samples. The areas exposed and sampled were specifically selected because they were points of possible contamination, and some samples from exposed areas did exhibit contamination. However, 500 left those exposed areas unprotected. These exposed areas remained unprotected during at least one heavy thunderstorm. This rainfall allowed

contamination that might have been present to travel to some extent.[57]

Upon its appellate review, the circuit court concluded that 500 failed to undertake all appropriate inquiries into the past use of the property before acquiring it, and subsequently failed to exercise due care, and stated in part as follows:

> 500 claims that the [H]earing [O]fficer made two errors. First, the hearing officer denied 500 the innocent purchaser defense under *U.S. v. Township of Brighton* [.][58] ... The innocent purchaser defense requires that on or before the date on which [ ] 500 acquired the facility, 500 carry out all appropriate inquiries into the previous ownership and uses of the facility in accordance with generally accepted good commercial and customary standards and practices; and take reasonable steps to stop any continuing release; prevent any threatened future release; and prevent or limit any human, environmental, or natural resource exposure to any previously released hazardous substance ....[59] 500 contends that it met this standard by hiring Ro–Tech to perform an environmental investigation. Although 500 asserts they reasonably relied on Ro–Tech's environmental report, substantial evidence supports a contrary finding.

56. The Hearing Officer stated that "[500] prevented access to the site by fencing and installing a security system. 500 also asked its consultant whether paving the area or any other measures would be appropriate." Later in her report, the Hearing Officer stated that 500, unlike VAC, did cooperate with the Cabinet once aware of the site problem. The Hearing Officer stated, "500's culpability in the case is much less. 500 is not a manufacturing company accustomed to environmental regulations and issues. Instead, it is a partnership composed of developers and architects. 500 did not cause the initial releases, it merely became an unknowing waste site owner without making an examination of the site

adequate to find the contamination. Its culpability here is very small."

57. The Hearing Officer stated in her report that 500 failed to meet the first two elements of the defense, *i.e.*, failure to make an appropriate inquiry at the time of acquisition and failure to exercise due care once the hazardous substance was discovered, and, thus, there was no need to address whether 500 met its burden to establish that some other party was the sole cause of the release.

58. 153 F.3d 307 (6th Cir.1998).

59. *See* 42 U.S.C.A. § 9601(35).

Tim Daniels of VAC communicated to Ro–Tech that VAC experienced a chemical spill involving approximately one hundred gallons of nickel in 1982. Ro–Tech failed to perform soil or water sampling. Ro–Tech also did not examine available public records that would have indicated the extent of potential contamination on the [p]roperty.... Sanborn maps of the area classified the [p]roperty for long-term industrial use.... The [H]earing [O]fficer reasonably determined that Ro–Tech's investigation was cursory at best and 500 unreasonably relied upon it. This fact constitutes substantial evidence that neither 500 nor Ro–Tech made appropriate inquiries or inspection of the [p]roperty in order to qualify for the innocent purchaser defense.... [60]

500 argues that there was not substantial evidence to support this finding, but rather the evidence showed that 500 acted as a reasonable developer by retaining an expert "to conduct whatever the expert deemed necessary and then rely on the expert's conclusion." 500 further argues that the circuit court found problems with Ro–Tech's actions,[61] and not 500's actions; and 500 argues that since there was no evidence that 500 negligently hired Ro–Tech, 500 should not be found at fault for relying on Ro–Tech. To the contrary, the Cabinet argues that it was not its responsibility to prove that 500 had negligently hired Ro–Tech, but rather it was 500's burden to prove the elements of the innocent purchase defense. We agree.

 By asserting the innocent purchaser defense, 500 "shift[ed] the burden of proof on th[e] question [of causation] from the plaintiff to the defendant, who must show by a preponderance of the evidence that the release or threatened release was caused solely by an unrelated third party" [citations omitted].[62] Thus, in reviewing the evidence the circuit court properly upheld the Secretary's denial of 500's innocent purchaser defense as 500 failed to meet certain elements of the defense. There is a "heavy burden of proof necessary to avoid liability" through the innocent purchaser defense, and there is a "high duty of inquiry attached to commercial transactions[.]"[63] There is proof of record that regardless of whether 500 properly relied on Ro–Tech's evaluation of the site, it failed to take due care when it demolished the site and took no action to abate the problem once it knew of the contamination problems at the property site.[64]

*Limitations of Liability*

500's second alternative argument is that even if this Court concludes that it was properly denied the innocent purchaser defense, then there should be limitations on its liability. It asserts this limitation as an affirmative and separate defense available in Kentucky Superfund cases to avoid the strict liability scheme when no causation can be proved.[65]

---

60. 42 U.S.C.A. § 9601(35).

61. The Hearing Officer in her opinion stated that the Ro–Tech inspection was cursory and found fault with Ro–Tech's investigation because it did not inspect the public records or undertake soil sampling and it failed to perform testing to determine whether the nickel spill acknowledged by Daniel had caused contamination. Mangun testified that he would have recommended sampling at the time 500 purchased the property.

62. *Foster,* 922 F.Supp. at 658.

63. *Id.* at 654–55.

64. *Id.* at 655.

65. *See Brighton,* 153 F.3d at 318–19.

KRS 224.01–400(25) states that a defendant's liability can be limited to zero if it is shown by a preponderance of the evidence that the contamination on the site represented a divisible harm and 500's contribution to the harm was zero. In support of this defense, 500 argues that there is no evidence that it caused or permitted release of the contaminants, and thus it is entitled to a reduction of its liability to zero. The Hearing Officer found as follows:

I have reviewed and considered the voluminous citations offered by both parties. I conclude that 500 bears some share of proportionate responsibility for the harm in this case, that 500 did not establish that the harm was divisible, and that the divisibility defense is unavailable to 500.

First, I conclude from the evidence that at least some portion of the harm at the site resulted from 500's movement of concrete floors (exposing contamination to the elements) and 500's failure to protect the contaminated area from rainfall. It is a matter of common knowledge that exposing contamination to rainfall increases the potential for harm from contaminant migration, and contamination kept under a concrete floor is less likely to be exposed to rainfall. In numerous sections the regulations acknowledge the increased potential for harm from precipitation where they include requirements designed to minimize exposure of waste piles to precipitation. It would require me to ignore basic physics to believe that exposing the contamination to precipitation would not cause it to migrate and spread to some degree into the soil. Case law has made clear that where human activity is involved in the movement of hazardous substances on property, the current landowner shares liability for resulting harm. *U.S. v. 150 Acres of Land,* 204 F.3d 698, 706 (6th Cir.2000).

The record provides me no reasonable basis to determine how much of the contamination resulted from the original release, and how much resulted from 500's exposure and spread of contamination that has clearly occurred. Unlike the situation in *Brighton Township,* where the defendant suggested apportionment according to volume contributed or to the areas of the site used by a particular defendant, in this case 500 has shown no evidence that its share of the harm can be fairly distinguished from that of VAC. Since there is some element of fault on 500's part, and I cannot fairly apportion the amount, I must conclude that the harm is indivisible and reject 500's defense.

Since I conclude that there was some portion of fault attributable to 500, it is unnecessary for me to address whether a landowner would bear some proportion of liability merely by their status as landowner, as indicated by *Meyer.*[66]

The circuit court did not directly address this defense, but found 500 liable and did not reverse the Cabinet on this issue. As we have discussed earlier, we conclude that there was substantial evidence to show that 500 contributed to the contamination of the site. Thus, we also agree that this defense is not proper; and we conclude that the circuit court did not err in affirming the Cabinet on this issue.

### VAC ARGUMENT

VAC argues in its appeal that it was improper for the Hearing Officer to penalize VAC for failing to provide an adequate site characterization report, and further that the Cabinet failed to provide guide-

---

**66.** *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497 (6th Cir.1989).

lines for such reports, making VAC's compliance therewith impossible. The Hearing Officer assessed a penalty against VAC in the amount of $160,000.00.[67] Both VAC and 500 submitted site characterization reports.[68] The Hearing Officer found that 500's report was adequate, but that VAC's report was not.[69] VAC argues that there was no purpose served under the statute by requiring duplicative site characterization reports and that because 500 was the entity in possession or control of the property at the time the requirement became effective, 500 was in a better position to file the report, and since 500 filed an adequate report, there was compliance with the statute and VAC should not be penalized. VAC further argues that the circuit court failed to make a finding of fact on the merits of this argument and that it is clear from the Hearing Officer's report that its only reason for penalizing VAC was based on the inadequacy of the site characterization report.

■ In reviewing the Hearing Officer's report, we reject VAC's arguments. The Hearing Officer found that VAC violated KRS 224.01–400(18) and in great detail stated her reasons for assessing the penalty which included reasons other than the failure of VAC to file an adequate site characterization report. The Hearing Officer stated as follows:

The Secretary has discretion, within the statutory limits, to impose the penalty he believes appropriate to achieve the goal of assuring compliance with environmental laws. While violations did occur during a lengthy time period, I do not recommend that the Secretary exer-

cise his discretion to impose penalties for every day of those violations from the time of the releases until now. At a certain point, the amount of such a penalty would become meaninglessly large, and loses its effect to deter violations. Further, for penalty purposes the twin failures to characterize and to remedy the releases should be merged, as they arise from the same set of circumstances.

Consistent with the above, I recommend that the Secretary impose a penalty for each of the days on which the record shows that Defendants received notice from [the Cabinet] of the contamination giving rise to their obligations under the statute (and thereafter did not fully comply), and each of the days that the [Cabinet] was on-site conducting sampling activities, for a total of eight days (in VAC's case) or seven days (in 500's case). Eight days of penalty at a rate up to $25,000.00 per day would result in a penalty between $0 and $200,000. Such a penalty would be sufficiently punitive to achieve the Cabinet's goals given the factors outlined above, without becoming meaninglessly large.

In VAC's case, on at lease five occasions VAC received notice from the [Cabinet] concerning the contamination on site: September 30, 1994; May 17, 1996; July 17, 1996; October 28, 1996; and April 23, 1997. Also, the [Cabinet] or its designees were on site to conduct sampling on three occasions: March 13, 1996; March 13, 1997; and June 12, 1997. Therefore, penalties should be as-

---

67. The amount of the penalty was based on eight days of violations, at $20,000.00 per day.

68. The Cabinet did not respond to VAC's site characterization report.

69. The Hearing Officer found that VAC's plan addressed some, but not all contaminants it released at the site and that it did not include a plan for addressing the chlorinated solvents at the site.

sessed against VAC for eight days of violations.

. . .

Next, I consider what penalty amount between $0 and $25,000 daily would be appropriate. The facts differ greatly as between VAC and 500. Concerning VAC, the factors concerning seriousness, economic benefit, culpability, and good faith weigh most strongly in favor of a severe penalty. VAC has caused multiple releases during its operation of the facility and its actions have resulted in releases thereafter. It has been informed of its duties and responded with little more than finger pointing.

VAC argues that any penalty should be small. It notes that it submitted a characterization report in 1999 that it believed would be sufficient, and that the requirements for such a report are not clear. However, the characterization report VAC submitted is clearly not sufficient under any criteria. The purpose of such a report is to define the extent of contamination so that a remedial plan can be developed and implemented. Instead, VAC's report focuses on who caused the contamination, and does not address the extent of contamination from the releases noted above, including VAC's own operations on site.

VAC's actions and inaction with respect to its releases as discussed above provide compelling reasons for the Hearing Officer to assess a severe civil penalty against VAC. Therefore, I recommend that VAC be assessed a penalty of $20,000 per day for each of eight days, for a total penalty of $160,000.

The Hearing Officer specifically addressed the seriousness of the violations in relation to the penalty in her report and stated as follows:

The first criterion is the seriousness of the violations, taking into account the purpose of the regulations and the effect or potential effect of the violation on the environment. The intent of the statute prohibiting persons from causing releases or maintaining releases is to ensure hazardous materials do not impair human health or the natural environment. The intent of the statute governing release characterization is to determine the nature and extent of the release to develop a meaningful plan for minimizing the effects of the release.

The seriousness of the release is also impacted by the nature and extent of the release, and the potential or actual harm from the release. In this case, a variety of hazardous substances discussed above were released, including cancer-causing materials. While some of the concentrations of the materials were not high, they were above the levels considered to be safe for human exposure. Other samples were very high in concentration. There remains some uncertainty as to the size of the area affected by the releases however it can be said that the impact of the releases extended to areas off-site and to the groundwater. Further, the release was discovered many years ago, thus the exposure has been longstanding, increasing the seriousness of the violation. Based on these factors, I find these violations to be very serious.

The Hearing Officer's report shows other reasons forming the basis of the Hearing Officer's assessment of penalties,[70] including that VAC benefited economically from its failure to remedy the contamina-

70. The Hearing Officer acknowledged that there was little or no evidence of either of VAC's or 500's ability to pay a penalty, but acknowledged that both were ongoing enti-

ties. Further, the Hearing Officer stated that there was no evidence of a history of violations by either defendant.

tion,[71] it exhibited wanton disregard for the impacts of its activities on the local environment by failing to act after directed to do so by the Cabinet, and it further failed to cooperate with the Cabinet during its investigation process, showing no effort of good faith.

Despite, VAC's argument to the contrary, the circuit court did address the seriousness of the assessment of the Cabinet's penalty on VAC and stated as follows:

> VAC'S argument fails because it is too narrow. When assessing the penalty, the [H]earing [O]fficer considered several factors concerning the seriousness, economic benefit, culpability and good faith demonstrated by VAC, not simply the inadequate site characterization report. The record is replete with specific incidents of spills of hazardous materials attributable to VAC in violation of KRS 224.99–100(1).[72] Tim Daniel of VAC testified to one specific example. In 1983 or 1984 he discovered a hole in a junction box, a container through which untreated wastewater passed after the electroplating process, ... that caused the release of an unknown quantity of hazardous substances. VAC determined this was not a release and chose not to report it to the appropriate local or state

authorities. This and other evidence shows hazardous substances released by VAC contaminated the surfaces of the [p]roperty.[73] Substantial evidence supports the [H]earing [O]fficer's finding that VAC also benefited economically by avoiding the cost of cleanup and failed to act after being directed to do so. Accordingly, the [H]earing [O]fficer reasonably found that VAC exhibited a wanton disregard for the impacts of its activities on the local environment....

> Considering that KRS 224.99–010(1) permits the [Cabinet] to fine VAC up to $25,000 for each day in which a statutory violation continues, substantial evidence exists to support a reasonable and conservative fine of $160,000 against VAC.[74]

In review of the portions of the Hearing Officer's report and the circuit court's order that we have cited above, we conclude that VAC's claims are without merit. The penalty against VAC clearly is based on much more than its failure to file a site characterization report. The circuit court took the time in its order to fully address this argument. Therefore, we hold that there was substantial evidence to support the penalty regardless of the adequacy of VAC's site characterization report and affirm this portion of the circuit court's or-

71. The Hearing Officer stated in her report that "VAC was able to sell its goods without bearing the true cost of production, which should have included the costs of compliance with laws governing remediation. Its profit margin in those goods was increased by avoiding investigation and clean-up."

72. "Among these incidents, (1) VAC's 1982 spill of nickel plating solution onto the Main Street sidewalk, (2) VAC's leak from hole in wastewater treatment pipe, (3) VAC's 1983/1984 release of untreated wastewater into soil beneath the wastewater treatment area[,] and (4) VAC's 1987 abandonment of pits and trenches...."

73. "In 1990, ERCE, ... discovered residue in one abandoned pit located in the bonded warehouse that contained extremely high levels of chromium, nickel and lead. These residues were not removed during the decommissioning of the facility...."

74. "VAC could have been assessed a $25,000 penalty for each day beginning in the 1980s when the releases occurred and the remediation statute was in effect, up to at least the day of hearing, a period that extended over 10 years."

der.[75]

For the foregoing reasons, the orders of the Franklin Circuit Court are affirmed.

ALL CONCUR.

---

**75.** As a subpart to this argument, VAC argues that pursuant to KRS 244.01–400(14)(g), the Cabinet was required to provide guidelines for the preparation of site characterization reports and by failing to do so, its decision to find VAC's report inadequate is arbitrary. KRS 224.01–400(14)(g) states as follows:

The Cabinet shall be the lead agency for hazardous substance, pollutant, or contaminant emergency spill response and, after consultation with other affected federal, state, and local agencies and private organizations, shall establish a contingency plan for undertaking emergency actions in response to the release of a hazardous substance, pollutant, or contaminant. The contingency plan shall:

... [e]stablish procedures and techniques for identifying, containing, removing, and disposing of hazardous substances released or being released.

The Cabinet argues that this statute does not apply to site characterization plans submitted by liable persons under KRS 224.01–400(18). We agree and conclude that there is no merit to this argument. Further, we agree with the Hearing Officer that what made VAC's report defective was that it did not address all contaminants at the site and a plain reading of the statute would apprise the regulated community that all contaminants must be addressed.