**STAR RUN, INC., Appellant,**

v.

**COMMONWEALTH of Kentucky ENVIRONMENTAL AND PUBLIC PROTECTION CABINET, Appellee.**

No. 2008–CA–002187–MR.

Court of Appeals of Kentucky.

Oct. 29, 2010.

Discretionary Review Denied by Supreme Court Oct. 19, 2011.

Donald Duff, Frankfort, KY, for appellant.

Glina R. Bryant–Lentz, Frankfort, KY, for Appellee.

Before COMBS and MOORE, Judges; LAMBERT,[1] Senior Judge.

*OPINION*

MOORE, Judge.

Star Run, Inc., appeals from a judgment affirming the final order of the Secretary for the Commonwealth's Environmental and Public Protection Cabinet. We affirm because the circuit court's decision was not clearly erroneous and because there was substantial evidence to support the Hearing Officer's Report.

## FACTUAL BACKGROUND

Donna Johnson owned and operated Star Run, Inc., an underground mine in Pike County, Kentucky, between October 1999 and April 2001. The mining operation was thereafter closed.

Adeline and Curtis Conway live in Pike County and constructed a well on their property in 1981. The well is approximately 100 feet deep. The Conways have had problems with the quality of their well water for several years. It is undisputed that some of the problems with their well are of their own making. Other than replacing the pump from time to time, the Conways have never maintained the well since it was dug. The well has bio-fouling, contaminants, white mites and worms. Even without any contamination from another source, the well cannot be used as a source for drinking water without proper cleaning and maintenance and has not been used for drinking water since 2000 due to an odor akin to rotten eggs. Due to discoloration, the Conways do not use the well water for laundry, other than during periods of drought. The Conways, however, do use water from the well for dishwashing and bathing.

In 2000 and 2001, the Conways filed a Citizens' Request for Inspection with the

---

1. Senior Judge Joseph E. Lambert sitting as Special Judge by assignment of the Chief Justice pursuant to Section 11(5)(b) of the Kentucky Constitution and Kentucky Revised Statute (KRS) 21.580.

Regional Office for Environmental and Public Protection Cabinet because they believed the Star Run mine was impacting their well. Star Run's underground mining works were approximately 255 feet from the Conway well. The Cabinet conducted investigations and analyzed water samples from the Conway well and concluded that there was insufficient evidence to cite Star Run as the source of the problems the Conways were experiencing at that time.

In 2004, Mr. Conway made another Citizens' Request for Inspection with the Regional Office for the Cabinet. He complained that the Star Run operation had caused his well to go dry.

Todd Alfrey, the Cabinet's geologist, conducted a survey and took a water sample from the Conway well. Alfrey issued a report wherein he concluded that there had been a mine-related impact on the Conway well. In his opinion, this could be attributed to the underground mine operations associated with Star Run. Alfrey's conclusion was based on the water sample taken at that time, historical sampling data from his prior investigations and a review of underground mine maps for Star Run.

Inspector Eddie Kelly, an authorized representative of the Cabinet, thereafter issued a Notice of Noncompliance (No. 53–1212) to Star Run for violation of 405 Kentucky Administrative Regulation (KAR) 18:060 and Kentucky Revised Statute (KRS) 350.421. The violation was described as follows:

> Permittee has failed to minimize the disturbance to the General Hydrologic balance in the permitted and/or adjacent areas and to prevent material damage to the General Hydrologic outside the permitted area. Permit was impared (sic) user well water, northeast of permit on the property of Curtis Conway on Jimmie's Creek in Pike County.

The violation was marked as "non-correctable." The Cabinet sent a letter to Star Run requiring it to take steps to immediately provide drinking water for the Conways and to connect the Conways' residence to a temporary water supply within 48 hours.

Star Run did not comply with the Cabinet's requirement to supply the Conways with water. Because of this, the Cabinet issued another Notice of Noncompliance (No. 52–1213) for a violation of 405 KAR 18:060 to Star Run. The description of the violation was as follows:

> After receiving notification that the permittee had adversely impacted the water well on the property of Curtis Conway of Jimmie's Creek in Pike County, Ky., the permittee has failed to provide drinking water within (48) hours and has also not provided temporary water supply connected to the existing plumbing in (2) weeks as stated in the notification dated August 11, 2004.

This violation was marked as "correctable." The remedial measure was "to provide drinking water and connect temporary water supply."

The Cabinet issued a Failure to Abate Cessation Order to Star Run. The remedial measures specified therein were 405 KAR 18:060 and KRS 350.421, to provide drinking water and connect the Conways to a temporary water supply pursuant to the first Notice of Noncompliance.

In response to the Cabinet's Notices of Noncompliance and the Cessation Order, Star Run filed timely Petitions for Administrative Hearings for the separate Notices of Noncompliance from the Cabinet.

Regarding the first Notice of Noncompliance (No. 53–1212), a hearing was held over a period of seven days regarding the

causation of the adverse mining impact to the Conway well. The Hearing Officer issued a report, recommending that the Secretary of the Cabinet affirm the Non-compliance. The Secretary thereafter entered a final order, adopting the Hearing Officer's report.

Regarding the second Notice of Non-compliance (No. 53–1213), the Hearing Officer held a one-day hearing and issued a report wherein he recommended that the Secretary affirm the Noncompliance, Cessation Order and penalty assessment. The Secretary entered a final order, adopting the report of the Hearing Officer.

Star Run filed separate Petitions for Review in Franklin Circuit Court from the Secretary's final order. The circuit court *sua sponte* consolidated the actions and affirmed. Star Run has now timely appealed before this Court.

## STANDARD OF REVIEW

■■■ When analyzing a circuit court's decision affirming an administrative decision, we review whether the circuit court's decision is clearly erroneous. *500 Associates, Inc. v. Natural Resources and Environmental Protection Cabinet,* 204 S.W.3d 121, 131 (Ky.App.2006) (citations omitted). Regardless of whether a reviewing court would decide the case differently or if there are factual issues in dispute, a court may only overturn an agency decision when (1) the agency acts arbitrarily; (2) acts outside the scope of the authority granted to it by the General Assembly; (3) the agency decision is not supported by substantial evidence contained in the record before the agency; or (4) if the agency has incorrectly applied the law. *Kentucky Racing Comm'n v. Fuller,* 481 S.W.2d 298, 300–01 (Ky.1972); *Brown Hotel Co. v. Edwards,* 365 S.W.2d 299, 302 (Ky.1963).

■■■ When the agency's decision is supported by substantial evidence, reviewing courts must defer to the agency regardless of whether there is evidence to the contrary. *Kentucky Comm'n on Human Rights v. Fraser,* 625 S.W.2d 852, 856 (Ky.1981). In other words, if there is any evidence of substance to support the agency decision, a reviewing court must defer to that decision because such action could not be arbitrary. *Borkowski v. Commonwealth,* 139 S.W.3d 531, 533 (Ky.App.2004). Substantial evidence consists of "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chemical Co.,* 474 S.W.2d 367, 369 (Ky.1971). It is that "evidence which would permit a fact-finder to reasonably find as it did." *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky.1986). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *500 Associates, Inc.,* 204 S.W.3d at 131–32 (internal quotations marks and citations omitted). As long as substantial evidence exists to support the agency's decision, a reviewing court must defer to the agency even where there is conflicting evidence. *Id.* (citation omitted).

## ANALYSIS

1. Substantial evidence supports the Hearing Officer's findings that the Conway well was affected by the Star Run operation.

■■■ To survive the standard of review explained *supra,* Star Run first attacks the administrative decision by arguing that the Conway well was not impacted by ground-water from its underground mine. Star Run contends, therefore, that it did not

violate KRS 350.421(2)[2] and 405 KAR 18:060.[3]

To prove causation before the Hearing Officer, the Cabinet offered the testimony of Adeline Conway, Inspector Eddie Kelly, geologist Todd Alfrey, and engineer Jack Hampton, on rebuttal. Star Run called Donna Johnson, the owner and operator of the mine, and engineer David Newman, a hired consultant. The testimony of these witnesses is set forth in the Secretary's final order and will not be repeated here, other than specific attacks Star Run makes on the Secretary's final order.

Star Run argues that its mining operation was dry and therefore could not have impacted the Conway well. However, a report by the Kentucky Department of Mines and Minerals, dated October 7 and 11, 1999, included a notation that the condition of the mine was damp to wet.

Alfrey testified that there was some evidence that water was pooling into the mine. In a report by Alfrey in 2000, he noted that the mine was wet in some areas and dry in most areas. Alfrey also submitted a report in 2001, which identified the existence of subsidence cracks above the mine. One crack was located on the surface above an area identified as panels 1 and 2. Star Run filled the crack with concrete. According to Alfrey, it was not surprising that these cracks did not immediately impact the Conway well. He explained that it would have taken several years for the moisture in the Star Run mining operation to reach the Conway well.

Alfrey testified that there was some evidence that water was pooling into the mine, and he specifically testified that the mine was producing water. Regarding the area identified as panel 1, an underground map prepared by Star Run showed water covering a small area of that section.

Alfrey also testified that Star Run extensively mined an area consisting of approximately 32 acres in the Conway subwatershed area. This created a void which previously did not exist. He also testified that an encroachment in Area 3 placed the Star Run underground void approximately 255 feet to the Conway well. This created a way for the water to migrate to the Conway well. Specifically, he testified that "the Conway well is exactly positioned in a . . . locale that would be anticipated to have effect from [the Star Run] operation, and the waters moving through it." Alfrey testified that the Glamorgan, which is a transmitter, was transmitting water with sulfates in it from the Star Run mining operation to the Conway well.

2. KRS 350.421(2) provides that:
   Each permittee or operator of a surface or underground coal mine shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where the supply has been affected by contamination, diminution, or interruption proximately resulting from the surface or underground coal mine.

3. 405 KAR 18:060 provides that:
   (1) All underground mining activities shall be planned and conducted to minimize disturbance of the hydrologic balance in both the permit area and adjacent areas, in order to:
   (a) Prevent material damage to the hydrologic balance outside the permit area;
   (b) Support the approved postmining land uses in accordance with the terms and conditions of the approved permit and the performance standards of this administrative regulation.
   (2) Changes in water quality and quantity, in the depth to groundwater, and in the location of surface water drainage channels shall be minimized so that the approved postmining land use of the permit area is not adversely affected.

Jackie Hampton, called on rebuttal for the Cabinet, testified that he had been in the mine when it first opened in the 1990's. He found that area to be moist, with some scaling (sluffing of material) from the roof, indicating the presence of a significant amount of moisture. Hampton did characterize that section of the mine as being a considerable distance away from the area Johnson operated. Hampton testified that the Glamorgan seam was regarded as being a wet seam.

Regarding the condition of the Glamorgan seam, a video indicated that water could be seen dripping from the seam into the well shaft. Thus, this illustrated that the Glamorgan seam was an aquifer. Photographs were also introduced showing pooling at the Star Run at the wet seal[4] portal.

In Donna Johnson's testimony before the Hearing Officer, she testified that the mine was "bone dry." She also testified that during the mine's operation, she received a violation from the Mine Safety and Health Administration for dusty conditions inside the mine. So, she had to pump water into the mine to control the dust.

According to Newman's testimony, a dry mine tends to stay dry with little or no accumulation of water after completion of the mining. He contended that this was evidenced by the small wet seal that was used after the mine was closed. Newman testified that the size of the wet seal indicated that little or no water was expected to accumulate in the mine. Regarding any pooling of water at the wet seal area, Newman proffered that this was surface water pooling in that area.

Newman also testified that the cracks and encroachment did not allow additional water to infiltrate the mine. In Newman's opinion if the encroachments had caused problems, they would have shown up earlier in the 2000 and 2001 investigations. Newman argued that another mining operation (AEP) was the source of sulfates in the Conway well, not Star Run.

Star Run's second argument is that the encroachment and subsidence cracks were not a cause of contamination of the Conway well. But according to Alfrey's testimony, the encroachment of the Star Run's mining operation into the outcrop barrier near the Conway well in 2000 "started the ball rolling." The cracks in 2000 created an environment for water movement from the Star Run operation to the Conway well.

Alfrey also observed subsidence cracks in 2001, with a diameter of eighty feet. Alfrey opined that these cracks would direct additional water into the mine. He also concluded that an encroachment in one area created a way for the water to migrate to the Conway well and placed the underground void created by the Star Run operations approximately 255 feet from the Conway well.

Newman disagreed with Alfrey regarding the impact of the encroachment on the outcrop barriers. In Newman's opinion, the encroachments had no effect on the condition of the Conway well. He also testified that the encroachments near the Conway well, referenced by Alfrey, occurred in 1996. He maintained that had the encroachments impacted the Conway well, elevated sulfate readings should have appeared in the 2000 and 2001 investigations completed by Alfrey. Newman also testified that the subsidence cracks had

4. The wet seal was a four-inch culvert pipe used to prevent an accumulation of water in the closed mine.

been properly sealed. Therefore, water from the surface should not be going into the mining operation.

Star Run's third argument is that the elimination of Jimmie's Creek watershed as a source impacting the Conway well was against the evidence offered at the hearing. However, Alfrey testified that there were numerous sub-watersheds in the immediate vicinity of the Conway well. In his opinion, the Conway well is located in an isolated sub-watershed within the Jimmie's Creek watershed and the Star Run operation had disturbed 32.12 acres along the Glamorgan coal seam in the sub-watershed where the Conway well is located. Thus, Star Run had mined in the Conway sub-watershed over 32 acres, which created a void which had previously not existed.

Hampton, on rebuttal, also testified that the Star Run operation had created a large void, which in turn created a major change for the watershed. He agreed with Alfrey that the water in the Conway well was coming from the sub-watershed, as well as some flow from the mine because the void acted as a recharge. He opined that the void created by the Star Run mine would draw water from the subsidence cracks and that water would ultimately move toward the Conway well.

Newman testified that Jimmie's Creek is in a typical Appalachian hollow, so the entire hollow would operate as a watershed for the Conway well. He disagreed with Alfrey's opinion that the Conway well was an isolated sub-watershed.

The Hearing Officer noted that the opinions of Alfrey and Newman were "strongly divergent. . . ." Thus, credibility was at issue and reviewing courts defer to the credibility findings of the trier of fact. *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky.2000). While the Hearing Officer found some problems with Alfrey's testimony, he concluded that Alfrey's testimony was sufficient for a prima facie case to support the issuance of the Notice of Noncompliance. The Hearing Officer did not accept Newman's testimony and found the testimony for the Cabinet to be more credible for the following reasons:

83. First, Newman really did not credibly explain why the underground void could not be an influence on the Conway well. In fact while arguing the mine should remain basically dry, he also conceded (as he had to) that the mine would accumulate some water. TE Day 5 p. 156. He simply stated without explanation that the sulfate values in the Conway well would not change.

84. Second—the evidence is undisputed that the Glamorgan seam itself is a water bearing aquifer with the dip of the seam angling toward and through the Conway well. Although the main source of [the] water for the Conway well may have been from a strata lower than [the] Glamorgan, the video-cam clearly showed water from the Glamorgan seam infiltrating the well.

85. Third—Newman, and to a lesser extent, Alfrey, was making an assumption that the mine would need to accumulate a significant volume of water to serve as a source for the Conway well. Actually, that is not true and the Cabinet's witness Jackie Hampton more correctly pointed out that the works themselves manifested a major change to the underground hydrology and geology of the area.

86. In the end, the Hearing Officer finds the Cabinet's *prima facie* explanation more compelling and persuasive, even though there are some problems with it. Unlike Alfrey, the Hearing Officer does not find particularly persuasive that there were subsidence cracks in the area except to the extent it is a manifestation of the fact that the underground

works were very close to the well. What the Hearing Officer does find persuasive are the following facts:

a. The mine void itself was in the immediate vicinity of the Conway well and a considerable portion of it was in the recharge zone of the Conway well.

b. Although not precisely measured, there was an encroachment in Area 3 that put the extent of the underground works very close (about 255 feet) to the Conway well.

c. The sulfate levels, pH and metals in the Conway well are chemically similar to the water quality that was projected by the permit designer.

d. The gradual elevation of the sulfate levels in the Conway well is consistent with a gradual transmission of water moving through the underground void and making its way into the Conway well. In this case mining was completed in 2001, and by 2004 the Conway well had an elevated sulfate level in their water. The time for transmission was as Alfrey put it, about right for the sulfate levels from the mine water to be affecting (influencing) the Conway well.

87. **Taking all of the foregoing into account, the Hearing Officer is of the opinion that the one irrefutable fact in this case (and perhaps the most persuasive one) is the fact that Star Run created a new void in the recharge area that was directly supplying the Conway well, and any water coming into contact with that void would pick up sulfates from the underground disturbance.** The creation of a new space, where one did not previously exist, is a fundamental and to a certain extent unpredictable change in the underground hydrology. Although permit engineers and hydrologists can make predictions in the permit applications as to whether there will be an impact on nearby water well users, the fact remains that no one really knows (especially in a stress relief zone) whether there will be an impact until after the mining is completed.

88. It is also a fundamental fact that in most mines some water will move into the underground works. As pointed out by Hampton, for there to be an influence on a nearby well there does not need to be a significant accumulation of water. In fact, he noted that if he could go into the mine today and it was dry, his opinion would not change. Some water would channel through the mine and that water would pick up sulfates and move onto the Conway well due to the encroachment, or simply because the void created a new (and unexpected) hydrologic connection between the underground works and the well. These determinations are not meant to convey a finding that Star Run did anything wrong—the impact on the Conway well is a consequence that the operators of underground mines would like to avoid, but there is no guarantee that it will be able to avoid.

89. Does this conclusion mean that the AEP works could not be a source of sulfates? If the truth be known, the Hearing Officer cannot completely rule out or assume that the only source of sulfates was from the underground mine and there may have in fact been some infiltration into the zone of recharge from the AEP mine. However, the underground works created by Star Run created the opportunity for whatever sulfates that may have come from the AEP mine to influence the water quality of the Conway well. Although the evidence is conflicting, the Hearing Officer concludes that but for the existence of the void created by Star Run, the Conway well would not have been impacted.

90. ... In the final analysis, the Cabinet's case is much more plausible than the Petitioner's contentions that its mine cannot be held at all accountable because it believes that a surface mining operation, at a different elevation, of a limited disturbance in the watershed, and only remotely connected hydraulically is the more likely proximate cause for the elevated sulfate level.

91. Thus, in conclusion, the Hearing Officer finds [that] as an ultimate fact, based on the preponderance of the evidence presented in this case, that the Petitioner failed to establish that it was not responsible for the elevated sulfate levels in the Conway well. To that end, the Hearing Officer incorporates into his ultimate findings and conclusions of law the findings made by Alfrey and Hampton and does not accept the opinions expressed by Newman with respect to causation.

(Emphasis added and note omitted).

After reviewing the record and giving due deference to the credibility determinations of the Hearing Officer, substantial evidence supports his report as adopted by the Secretary. Accordingly, the circuit court was not clearly erroneous in affirming the Secretary's final order. Thus, we find no error.

2. KRS 350.421 and 405 KAR 18:060 were properly interpreted and applied under the facts of this case.

A. Star Run's argument that it cannot be accountable for any impact to the Conway well due to the condition of the well is not statutorily supported.

█ Star Run turns to statutory interpretation for relief. First, it argues that 405 KAR 18:060 and KRS 350.421(2) require replacing only an uncontaminated water supply, not one that is already unfit for drinking water and other uses. Star Run argues that the language used in 405 KAR 18:060 requires that the permanent water supply to be provided is to be the "equivalent to premining quantity and quality" and requires providing replacement for drinking water. Because it is undisputed that the Conway well was not used for drinking water and was otherwise contaminated regardless of any impact by Star Run, Star Run argues that the Secretary misinterpreted the intent behind these regulations. Thus, Star Run contends that the plain meaning of KRS 350.421(2) leads to a logical conclusion that it should not have been cited even if underground water from its mine migrated into the Conway well.

The Cabinet responds arguing that the Conways do continue to use the water for some purposes and that Star Run did not establish non-usability for all domestic purposes prior to any mining-related adverse impact. The Cabinet also points out that the Conways could easily correct the pre-mining problems with their well water with cleaning and routine maintenance; however, even with cleaning and maintenance, the sulfates from the mining operation would remain. The Cabinet argues that the plain meaning of KRS 350.421 "provides for the protection and replacement of Kentucky's water resources when coal mining impacts have been proven."

The parameters of statutory construction by which we are guided are well stated in *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky.2005):

It is this Court's duty when interpreting statutes to give effect to the General Assembly's intent, but "no rule of interpretation ... require[s] us to utterly ignore the plain ... meaning of words in a statute." In fact, "[t]he plain meaning of the statutory language is presumed to be what the legislature intended, and if

the meaning is plain, then the court cannot base its interpretation on any other method or source." We "ascertain the intention of the legislature from words used in enacting statutes rather than surmising what may have been intended but was not expressed." In other words, we assume that the "[Legislature] meant exactly what it said, and said exactly what it meant." Only "when [it] would produce an injustice or ridiculous result" should we ignore the plain meaning of a statute.

(Notes and citations omitted).

KRS 350.421(2) provides:

Each permittee or operator of a surface or underground coal mine shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where the supply has been affected by contamination, diminution, or interruption proximately resulting from the surface or underground coal mine.

Even giving credence to Star Run's argument that the Conway well contained contaminants prior to any mining impacts, the plain language of this statute supports the Cabinet's interpretation of KRS 350.421(2). The water supply need not be the Conways' exclusive water supply. So long as part of the Conways' water supply that is used for domestic and other legitimate purposes have been "affected" by underground coal mining, the statute mandates replacement of the water supply by using the word "shall." To add the words "drinking water" or to place conditions on the pre-existing quality of the water supply, particularly where the pre-mining condition of the water is correctable, is contrary to statutory construction principles because the statute is not so limited. Given the presumptions to which the General Assembly is entitled in choosing the words used in statutes, we agree with the Cabinet's interpretation of KRS 350.421(2).

The record illustrates that prior to the sulfate contamination, the Conways could have cleaned their well so that the water would have been suitable for drinking and other household purposes. Alfrey testified that the conditions of the Conway well would not affect the sulfate readings in the water. However, once the well was contaminated with sulfates, the Conways could no longer simply take corrective measures to clean their well. The sulfates have changed the quality and condition of the well water in a way the lack of maintenance and cleaning did not. Testimony at the hearing supports the conclusion that the condition of the well was correctable prior to the sulfate contamination. Thus, there is no error in the interpretation and application of KRS 350.421(2) in this case.

B. Star Run's argument that the lack of water quality standards under Kentucky law does not provide relief from the Cabinet's enforcement action.

■ Star Run next argues that the enforcement action against it must be dismissed because the Cabinet has not established standards to determine violations of KRS 350.421 or 405 KAR 18:060. The Cabinet's actions were based on the determination that Star Run had contaminated the Conway well because the water samples contained sulfates that exceeded the National Secondary Drinking Water Standard of 250 milligrams per liter, not standards set forth by Kentucky statutes or regulations. Accordingly to Star Run, the lack of standards by which to measure the level of contamination is in itself arbitrary and capricious.

It is important to note that the Hearing Officer found that:

the evidence that the Conways' well had been impacted by sulfates is essentially undisputed. The principal focus of this case is centered on the source of the sulfates and whether the impact could be proximately attributed to the underground mine works associated with the Star Run mine.

Accordingly, there is not a dispute regarding whether the sulfates impacted the Conway well; the record contains substantial evidence of this impact. Regardless of whether there is a statutory or regulatory standard in Kentucky for the amount of sulfates necessary to qualify as a contaminant, in this case the Hearing Officer concluded—and there is substantial evidence in the record for this conclusion—that there were sufficient quantities of sulfates to contaminate the Conway well. The Hearing Officer found that the Conways' "water supply had been contaminated by a high level of sulfates, ranging from 320 to 702mg/l in 2004–2005." According to the Hearing Officer's report, "a standard marker is an elevated sulfate reading greater than 100–150mg/l."

The General Assembly in KRS 350.421(2) chose to require replacement of a water supply that has been *"affected* by contamination, diminution, or interruption proximately resulting from the surface or underground coal mine." (Emphasis added). Here, it is unquestionable that the Conway well was *affected.* The record firmly supports a finding that even without a specific statutory level of contaminants, the Conway well water was contaminated by a high level of sulfates and can no longer be put back into the condition it was prior to the sulfate contamination. Accordingly, regardless of the lack of a specific statutory standard, substantial evidence supports the determination that the level of contamination is sufficiently elevated such that the findings and conclusions of the Hearing Officer are not arbitrary and capricious.

C. Star Run's argument that Kentucky's water replacement requirements are invalid is without merit.

■ Star Run next argues that the provisions of 405 KAR 18:060 requiring a prompt replacement of the water supply; replacement of drinking water within 48 hours; and providing a temporary water supply for household purposes within two weeks are invalid. According to Star Run's theory, pursuant to KRS 13A.120 and KRS 13A.130, 405 KAR 18:060 impermissibly modifies and expands KRS 350.421(2), thereby rendering the regulation null, void and unenforceable.

Star Run also argues that the timelines in Kentucky's regulations are more stringent than its federal counterpart[5] which only requires "prompt" action. Star Run contends that this violates KRS 350.465(4) providing that "[t]he cabinet shall not promulgate regulations which are inconsistent with the Surface Mining Control and Reclamation Act of 1977, PL 95–87."

The Cabinet responds arguing that KRS 350.020 directs it "to rigidly enforce this chapter and to adopt whatever administrative regulations are found necessary to accomplish the purpose of this chapter." Given this broad delegation to the Cabinet to adopt regulations to carry out the General Assembly's intent to protect water supplies impacted by coal mining, we find that 405 KAR 18:060 is a proper use of the Cabinet's authority.

■ Regarding whether Kentucky's regulations are more stringent than the federal requirements, the Cabinet notes that the Office of Surface Mining and Rec-

---

5. Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328.

lamation and Enforcement (OSM) issued 60 FR 16727 (March 31, 1995). This Final Rule was issued after holding hearings in numerous locations, including Kentucky. The Final Rule includes the following:

A commenter recommends that the definition of "replacement" address time limits for providing both interim replacement and permanent replacement. The commenter recommends a 48–hour time period to provide a temporary replacement and 1–2 years to provide permanent replacement. OSM agrees that some guidance on the issue of timing of water supply replacement would aid in consistent implementation of replacement requirements. If a temporary water supply is needed before the permanent replacement water supply is provided, it is reasonable to expect that the permittee will provide replacement within a reasonable amount of time. OSM believes that prompt replacement should typically provide: emergency replacement, temporary replacement, and permanent replacement of a water supply. Upon notification that a user's water supply was adversely impacted by mining, the permittee should reasonably provide drinking water to the user within 48 hours of such notification. Within two weeks of notification, the permittee should have the user hooked up to a temporary water supply. The temporary water supply should be connected to the existing plumbing, if any, and allow the user to conduct all normal domestic usage such as drinking, cooking, bathing, and washing. Within two years of notification, the permittee should connect the user to a satisfactory permanent water supply. This guidance is intended to assist regulatory authorities in deciding if water supplies have been "promptly" replaced.

*Id.* at 16727.

Given this guidance from the federal agency and given that the relevant federal standards require prompt water replacement, we disagree with Star Run's argument that Kentucky's regulations are inconsistent with the federal act.

For the reasons as stated, we hereby affirm the decision of the Franklin Circuit Court.

ALL CONCUR.